## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TOTAL QUALITY LOGISTICS,
LLC,

               Plaintiff,                      Case No. 1:21-cv-164
                                             JUDGE DOUGLAS R. COLE

    v.

EDA LOGISTICS, et al.,
               Defendants.

## OPINION AND ORDER

This cause is before the Court on two pending motions: (1) Total Quality Logistics' ("TQL") Motion for a Preliminary Injunction (Doc. 3); and (2) Defendants EDA Logistics ("EDA") and Ryan Daniels' (collectively, "Defendants") Motion to Dismiss TQL's Complaint (Doc. 8).

For the reasons below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss and **DENIES** TQL's Motion for a Preliminary Injunction.

## BACKGROUND[1]

### A.  Daniels Worked At TQL And Signed A Non-Compete Agreement.

In late 2015, Ryan Daniels, "a seasoned sales professional," was on the job hunt. (TQL's Exs. to Prelim. Inj. Hr'g, Ex. 1, "Daniels Resume"). Daniels' resume from

---

[1] The "facts" in this section are taken from the Complaint and certain evidence introduced at the preliminary injunction hearing. Given the nature of the hearing, the Court considers both the information from the Complaint and the evidence from that hearing to be preliminary in nature. That is, the Court's reporting of the "facts" here should not be understood as a finding that those are the actual facts of this case. Rather, the Court treats them more in the nature of allegations.

that period highlighted his ten years of "sales and management experience," which included time working as an Assistant Manager at Footlocker, a seven-year stint as a Universal Sales Consultant with Verizon Telecom, and his rather recent tenure as a Financial Representative with Northwestern Mutual. (*Id.*).

On January 4, 2016, Daniels landed a job as a Logistics Account Executive Trainee with TQL, a company that provides freight transportation and logistics services. (Compl., Doc. 2, ¶ 16, #47; TQL's Exs. to Prelim. Inj. Hr'g, Ex. 2, "Daniels Hiring Email"). On the first day of his new job, Daniels signed a non-compete and non-solicitation agreement. (Compl., Doc. 2, Ex. A, #58–64, "NCA"). In the non-compete portion of that agreement, Daniels agreed that he would not "own, operate, maintain … [or] engage in … any Competing Business." (*Id.* at ¶ 9(b)(i)). The agreement defines "Competing Business" to include "any … entity that is engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services anywhere in the Continental United States." (*Id.* at ¶ 9(f)). The non-solicitation half of the agreement, meanwhile, prohibits Daniels from "solicit[ing] any customer … or tak[ing] any action … to divert business from TQL." (*Id.* at ¶ 9(b)(iii)). These restrictions last only "for a period of one (1) year after termination or cessation of [Daniels'] employment." (*Id.* at ¶ 9(b)). But the agreement further provides that the one-year period would be tolled for any period of time during which Daniels was in violation of his obligations under those terms. (*Id.* at ¶ 9(b)(vi)).

During his time at TQL, Daniels worked his way up from Logistics Account Executive Assistant, to Logistics Account Executive, to Saturday Group Leader, to

Sales Team Leader. (Compl., Doc. 2, ¶ 16, #47). The Court's principal understanding of those various roles comes from Marc Bostwick, a TQL employee who held these same positions during part of his 18-year tenure with TQL, and the only witness who either side called at the recent hearing on TQL's motion for a preliminary injunction. Bostwick testified that Daniels' primary responsibility in those various roles was to manage customer accounts. More specifically, Bostwick explained that Daniels would have cold-called potential customers, as well as coordinated services and provided pricing estimates for existing customers. (Bostwick Test., Hr'g on Prelim. Inj. Mot., Apr. 29, 2021).

## B. Daniels Resigned From TQL And TQL Suspected That Daniels Began Violating His Non-Compete.

On June 29, 2020, Daniels voluntarily resigned from TQL. (Compl., Doc. 2, ¶ 16, #47; TQL's Exs. to Prelim. Inj. Hr'g, Ex. 7, "TQL Separation Email"). When Daniels left TQL, it triggered his one-year obligation under the non-compete and non-solicitation agreements. (NCA at ¶9(b)). It appears, though, that within a few months after leaving TQL, Daniels may have decided that he was not entirely done with the freight-brokering industry. Evidence suggests that, on August 20, 2020, Daniels organized EDA Logistics, a limited liability company designed to conduct "freight arrangement services." (TQL's Exs. to Prelim. Inj. Hr'g, Ex. 12, "W. Va. Sec'y of State Bus. Org. Detail"). Then, on September 14, 2020, it appears that the Federal Motor Carrier Safety Administration granted the newly formed EDA Logistics a form of motor carrier authority called "broker" authority. (TQL's Exs. to Prelim. Inj. Hr'g, Exs. 13, 14, "FMCSA Licensing History"). This is the same type of authority that TQL

uses to conduct its transportation-brokering services. (Bostwick Test., Hr'g on Prelim. Inj. Mot., Apr. 29, 2021).

While Daniels apparently was taking these steps to form his new LLC, TQL was busy trying to figure out why it had experienced a significant drop in business with respect to one of its repeat customers, Sunland Trading, Inc. TQL had long undertaken efforts to attract Sunland's business. In fact, the records that TQL provided at the evidentiary hearing showed that TQL's logistics accounts executives began calling on Sunland as early as 2016. (TQL's Exs. to Prelim. Inj. Hr'g, Ex. 6, "Sunland Customer Timeline"). But, despite repeated calls, TQL had no success until March 2, 2018, when Michael Henshall, one of TQL's account executives, successfully bid for a piece of Sunland's business. (*Id.*). Then, when Michael Henshall left TQL in June 2018, he passed the Sunland account over to Daniels. (*Id.*). From that point forward, Daniels handled Sunland's business until he left TQL, in June 2020. (*Id.*).

During 2020 and continuing into this year, Sunland's book of business with TQL steadily shrunk. TQL's records show a 41% drop in revenues from Sunland from quarter one of 2020 to quarter two of that same year, while Daniels was still with TQL. (TQL's Exs. to Prelim. Inj. Hr'g, Ex. 9, "Sunland Revenue Chart"). This trend continued into the third quarter, which is the quarter right after Daniels left TQL. At that time, TQL experienced an additional 61% drop in Sunland's business. (*Id.*).

TQL became suspicious that this drop in business occurred because Daniels may have used connections he developed at TQL to solicit Sunland's business after his departure. (Bostwick Test., Hr'g on Prelim. Inj. Mot., Apr. 29, 2021). TQL

commenced an internal investigation where it learned the facts alluded to above—that Daniels had both started EDA Logistics and obtained "broker" authority.

The investigation also turned up two email chains between TQL, 721 Logistics (another broker company), and Sunland, which showed that Daniels had some contact with Sunland after his departure. The email chains revealed that on October 28, 2020, and then again on January 18, 2021, Daniels received an email from 721 Logistics about a potato starch shipment from Sunland. (TQL's Exs. to Prelim. Inj. Hr'g, Exs. 10, 11, "Potato Shipment Emails"). Notably, nowhere in either email chain does Daniels respond to, or reach out to, Sunland. Rather, the Potato Shipment Emails merely show, at the bottom (and thus the start) of a long chain, that Sunland sent an email to Daniels. All that is there is the subject-line header, which indicates that the emails concerned a potato starch shipment. There is no indication regarding the contents (if any) of the communication between Daniels and Sunland. A TQL representative confirmed at oral argument that the business from the potato starch shipment, in fact, eventually went to TQL. (Bostwick Test., Hr'g on Prelim. Inj. Mot., Apr. 29, 2021).

## C.     TQL Sued EDA Logistics And Daniels.

On February 22, 2021, TQL filed a complaint in the Clermont County Court of Common Pleas, alleging (1) a breach of contract claim against Daniels; (2) a misappropriation of trade secrets claim against EDA Logistics and Daniels; (3) a tortious interference with a contract claim against EDA Logistics; and (4) a tortious interference with a business relationship against EDA Logistics. (Doc. 1-1). TQL

requested damages and injunctive relief on all counts. (*Id.*). That same day, TQL also filed a motion for a preliminary injunction and temporary restraining order. (Doc. 3). On March 1, 2021, a Clermont County judge denied TQL's request for a temporary restraining order.

Shortly thereafter, on March 8, 2021, EDA and Daniels removed the case to this Court on diversity grounds. (Doc. 1). The next day, March 9, 2021, TQL re-filed its motion for a preliminary injunction in this Court. (Doc. 3). The parties finished briefing that motion on April 20, 2021, and the Court held a hearing on the matter on April 29, 2021.

In the meantime, Defendants filed a 12(b)(6) motion to dismiss. (Doc. 8). That motion argues that the Court should dismiss TQL's Complaint because it consists of "conclusory allegations and rote recitations of elements of [each] claim[]," and, as such, fails to satisfy *Iqbal* and *Twombly* pleading standards. (*Id.* at #94). The motion to dismiss, like the motion for a preliminary injunction, is fully briefed and ripe for review.

<u>**LAW AND ANALYSIS**</u>

The Court first addresses Defendants' Motion to Dismiss, and then turns to TQL's Motion for a Preliminary Injunction.

**A.** **TQL's Complaint Satisfies Minimum Pleading Standards With Respect To Three Out Of Four Claims.**

Federal Rule of Civil Procedure 8(a)(2) requires TQL to make a "short and plain statement of the claim showing that [it] is entitled to relief." This "short and plain statement" requirement, in part, serves a notice function, alerting the defendant not

only to the nature of the claim against it, but also to the "grounds upon which [the claim] rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). As part of the plaintiff's obligation to provide notice of the "grounds" for relief, the complaint must include "[f]actual allegations" that are "enough to raise a right to relief above the speculative level." *Id.* These factual allegations must support a claim that is "plausible on its face." *Id.* at 570.

Importantly, *Twombly*, and later *Iqbal*, require plaintiffs to do more than simply state the elements of the claim in fact-form. Allegations that the defendant committed an element of the claim—e.g., "defendants colluded"—are mere "conclusory" statements that do not suffice to state a claim under Fed R. Civ. P. 8. *See id.* at 557; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

That said, a plaintiff need not provide "detailed" factual allegations. *Twombly*, 550 U.S. at 555. In fact, allegations in the complaint need not even be particularly convincing. *Id.* at 555–56 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'") (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183, 191 (1984)). Rather, the facts in the complaint need only "raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claims. *Id.* at 556.

When evaluating the sufficiency of a complaint in the face of a motion to dismiss, the Court must accept all non-conclusory factual allegations as true. *Iqbal*, 556 U.S. at 678. To survive Defendants' 12(b)(6) motion, then, TQL's Complaint must

provide non-conclusory facts that, if true, plausibly support claims that (1) Daniels breached his non-compete; (2) Daniels and EDA misappropriated trade secrets; (3) EDA interfered with TQL's business relationships; and (4) EDA interfered with TQL's contracts.

### 1. The Complaint Plausibly Alleges That Daniels Breached His Non-Compete.

Start with TQL's claim that Daniels breached his non-compete. TQL presses two counts based on this alleged breach, one seeking damages and the other injunctive relief, but the underlying conduct (breach of contract) is the same. In order for these counts to move forward, then, TQL must plausibly allege the four traditional elements of a breach of contract claim: (1) the existence of a valid agreement; (2) that the plaintiff (TQL) performed; (3) that the defendant (Daniels) failed to perform; and (4) that TQL sustained injury.[2] *Horter Inv. Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 901 (S.D. Ohio 2017) (citing *Garofalo v. Chicago Title Ins. Co.*, 661 N.E.2d 218, 226 (Ohio Ct. App. 1995)). Of course, the nature of the requisite "injury" varies somewhat for the two forms of relief TQL seeks. TQL's claim for damages requires a showing of monetary injury, while TQL's claim for injunctive relief requires it to demonstrate "irreparable harm." *Aero Fulfillment Servs., Inc. v. Tartar*, No. C-060071, 2007 WL 120695, at *2, 4 (Ohio Ct. App. Jan. 19, 2007) (explaining that, while the violation of a covenant *could* constitute "irreparable harm," "[e]ach case presents a different factual scenario that must be independently reviewed to

---

[2] The Court considers the plausibility of each of TQL's claims under Ohio law pursuant to the choice-of-law provision in paragraph 10 of the non-compete agreement. (NCA at ¶ 10).

determine whether a breach will result, or has resulted, in irreparable harm"); s*ee also Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 280 (Ohio Ct. App. 2000).

Defendants move to dismiss both counts on the ground that TQL's Complaint fails to plausibly allege that Daniels "failed to perform"—i.e., that Daniels breached his non-compete agreement. Secondarily, Defendants argue that the Court should dismiss TQL's claim for damages because the Complaint did not plausibly allege the "damages [TQL] has suffered as a result of Daniels's alleged breach." (Mot. to Dismiss, Doc. 8, #97–98).

The Complaint provides sufficient facts to plausibly allege that Daniels breached the non-compete agreement. First, TQL alleges that, after Daniels left TQL, he "formed EDA [Logistics] for the purpose of conducting … 'transportation and freight arrangement services.'" (Compl., Doc. 2, ¶ 25, #49). The Complaint continues on to note that "EDA … holds authority to operate a freight brokerage under … the Federal Motor Carriers Safety Administration." (*Id.* at ¶ 26, #49). TQL then concludes that "[u]pon information and belief … Daniels is currently … performing freight brokerage services in violation of his NCA." (*Id.* at ¶ 30, #49). At first glance, such facts, assuming they are true, as the Court must at this stage, seem sufficient to give rise to a plausible inference of a breach.

Defendants' only real argument to the contrary is that these facts do not plausibly allege a violation of the non-compete because "TQL's complaint does not allege any specific facts that Defendant EDA is actually brokering freight." (Mot. to Dismiss, Doc. 8, #96). But that misunderstands a plaintiff's obligation at the

pleadings stage. To survive a motion to dismiss, TQL need not show that, in fact, EDA Logistics is *actually* brokering freight. Rather, the Complaint need only raise a "'plausible' inference" that Daniels has conducted freight-brokering services through EDA. *16630 Southfield Ltd. P'ship v. Flagstar Bank F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (citing *Iqbal*, 556 U.S. at 678).

Of course, the plausibility of any inference will depend on the Court's "common sense and the strength of competing explanations" for why Daniels apparently started EDA. *Id.* But, here, the facts in the Complaint, and particularly the allegation that EDA sought and received exactly the same kind of freight-brokering licensure that TQL uses to offer its services, give rise to the common sense, reasonable inference that Daniels is conducting freight-brokering services through EDA.

To be sure, it is also possible, as Defendants seem to suggest, that Daniels is just preparing to compete, and has yet to actually engage in any competitive activity. But it is at least as likely that Daniels has already conducted fright brokering services under the authority granted to his newly formed LLC. Selecting among these various competing possibilities requires information, which is what discovery is designed to facilitate. For now, though, it is enough to note that the facts alleged in the Complaint comport with Rule 8's pleading standards on the breach-of-contract allegations.

Defendants' argument directed at damages similarly falls flat. TQL provides a "short and plain" statement of each element of a breach of contracts claim, and then "directly alleges damages as a result of [Daniels'] breach." *Bridgestone Am.'s, Inc. v. Int'l Bus. Mach. Corp.*, 172 F. Supp. 3d 1007, 1022 (M.D. Tenn. 2016). This is all that

is needed to plausibly allege damages for a breach of contract claim. *Id.* Certainly, there is no requirement under federal law to plead any particular or specific *amount* of damages. *See Expert Janitorial, LLC v. Williams*, No. 3:09-cv-283, 2010 WL 908740, at *9 (E.D. Tenn. Mar. 12, 2010) ("There is no requirement that contract damages be pled with detailed specificity. Plaintiff has alleged [that it] … was damaged as a result [of the breach] and has suffered 'actual and consequential damages as may be proven at trial….' Such allegations are sufficient to state a claim for damages. The parties will have ample opportunity to access specific damage information through the discovery process."). Here, the allegations in the Complaint are that Daniels is competing with TQL for business, which creates a plausible inference that he is experiencing at least some success in that regard. If so, damages would naturally arise. Again, discovery, not a motion to dismiss, is the proper avenue to address any missing specifics about the existence, and amount, of any such damages. The Court, therefore, **DENIES** Defendants' motion to dismiss TQL's breach of contract claim.

### 2. *The Complaint Plausibly Alleges That Daniels And EDA Logistics Misappropriated Trade Secrets.*

To establish a misappropriation of trade secrets claim, TQL must plausibly allege (1) the existence of a trade secret; (2) that EDA/Daniels acquired the trade secret as a result of a confidential relationship; and (3) that EDA/Daniels engaged in unauthorized use of that trade secret. *Tomaydo-Tomahhdo, LLC v. Vozary*, 82 N.E.3d 1180, 1184 (Ohio Ct. App. 2017) (citing *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x. 860, 861 (6th Cir. 2008)). Defendants argue that

TQL's Complaint fails to plausibly allege the third element: that EDA/Daniels used TQL's trade secrets. (Mot. to Dismiss, Doc. 8, #98).

Like its breach of contract claim, TQL's misappropriation of trade secrets claim rests on Daniels's alleged involvement with EDA logistics, a (potentially) competing freight-brokerage company. Because Daniels founded EDA, TQL reasons, he "inevitably will use [trade secret] information … for his and EDA's benefit." (Compl., Doc. 2, ¶ 49, #52). Defendants are correct that this inference alone might not be enough to *prove* that Daniels is misappropriating trade secrets. *See Vozary*, 82 N.E.3d at 1186 (holding that an ex-employee opening a successful competitor does not, without additional evidence, support a misappropriation of trade secrets claim). But at this point in the process, federal pleading standards require TQL only to plausibly *allege* that Daniels is misappropriating trade secrets. The Court finds that TQL has met this burden here.

It is plausible that Daniels, who allegedly had no knowledge of the freight-brokerage business when he joined TQL, and who allegedly received and had access to trade secret information while at TQL, used those trade secrets to establish and (potentially) operate what appears to be a competing freight-brokerage business, EDA Logistics. Therefore, the Court **DENIES** Defendants' motion to dismiss TQL's misappropriation of trade secrets claim.

### 3. *The Complaint Fails To Plausibly Allege That EDA Logistics Tortiously Interfered With TQL's Business Relationships.*

A tortious interference with a business relationship claim requires the plaintiff to show: (1) a business relationship; (2) that the defendant knew of that business

relationship; (3) that the defendant intentionally obstructed that relationship; and (4) that the plaintiff sustained damages as a result. *Martin v. Jones*, 41 N.E.3d 123, 141 (Ohio Ct. App. 2015) (citations omitted). The Complaint's only support for this claim is that "upon information and belief, [Daniels is] doing business with at least one TQL customer with whom he worked while employed at TQL." (Compl., Doc. 2, ¶ 28, #49). This statement is purely conclusory. It does not provide the name of the customer at issue or any other factual context for TQL's claim. Without any factual content, the Court cannot "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Accordingly, TQL's claim for tortious interference with a business relationship does not rise to the level of plausibility. Rather TQL's claim is the type of "unadorned, the defendant-unlawfully-harmed-me accusation" that fails to make the cut under *Iqbal* and *Twombly*. *Id.* (citing *Twombly*, 550 U.S. at 555).[3] The Court thus **DISMISSES** TQL's claim for tortious interference with a business relationship. But, because TQL presented evidence at the preliminary injunction hearing suggesting that it may be able to supplement this claim, that dismissal is **WITHOUT PREJUDICE**.

---

[3] The Court noted earlier that TQL's Complaint had alleged sufficient facts to raise a plausible inference that Daniels was competing against TQL as part of his new position with EDA logistics. Although it is "plausible," based on the facts alleged, that EDA is operating and soliciting customers, it does not necessarily follow that EDA is soliciting *TQL's* customers. Thus, the fact that TQL has pled a plausible breach of contract claim does not require the Court to find a plausible tortious interference with a business relationship claim.

### 4.   *The Complaint Plausibly Alleges That EDA Logistics Tortiously Interfered With TQL's Contracts.*

The elements of a tortious interference with a contract claim are nearly identical to the elements of a tortious interference with a business relationship claim, the obvious difference being that the former involves intentional interference with a contract, not a business relationship. *See Fred Siegel Co. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999) (listing the elements of tortious interference with a contract). The contract at issue here is Daniels' non-compete agreement. TQL claims that EDA "intentionally interfered with [that contract] by entering into an employment relationship … with Daniels prior to the expiration of his restrictive covenants in the NCA." (Compl., Doc. 2, ¶ 61, #53). This is not enough to state a claim, Defendants contend, because, TQL "failed to allege that EDA actually engages in freight brokerage." (Mot. to Dismiss, Doc. 8, #99). Therefore, Defendants continue, TQL's Complaint "does not sufficiently allege that Daniels's employment violates the NCA." (*Id.*).

But the Complaint discusses EDA's activities in more detail than Defendants' motion to dismiss would suggest. As the Court discussed in the breach-of-contract analysis above, TQL's Complaint also included allegations that "Daniels formed EDA … for the purpose of conducting … freight arrangement services" and that "EDA … holds … freight brokerage … authority granted by the Federal Motor Carriers Safety Administration." (Compl., Doc. 2, ¶¶ 25–26, #49). Accepting these facts as true, EDA's purpose and authority both at least suggest that it is competing in the freight-brokering business. Importantly, the freight-brokering business is precisely the

industry that the NCA precludes Daniels from competing in until June 2021. These facts, then, raise a plausible inference that EDA is interfering with the NCA between Daniels and TQL. This "plausible inference" satisfies post-*Twombly* and *Iqbal* pleading standards and is thus sufficient to carry TQL's tortious interference with a contract claim over the line. *See Iqbal*, 556 U.S. at 663 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (citing *Twombly*, 550 U.S. at 556).

In sum, the Court **DENIES** Defendants' Motion to Dismiss with respect to TQL's breach of contract, misappropriation of trade secrets, and tortious interference with a contract claims. The Court **GRANTS** the motion with respect to TQL's tortious interference with a business relationship claim, but does so **WITHOUT PREJUDICE**.

## B. TQL Is Not Entitled To A Preliminary Injunction.

The Court considers four factors in deciding whether to issue a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019). No one factor is determinative, rather, the Court should "balance[] [the factors] against each other." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir.

2002) (citing *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.,* 163 F.3d 341, 347 (6th Cir. 1998)). That said, a finding that there is no likelihood of success on the merits tips that balance in such a way that is "usually fatal" to the request for a preliminary injunction. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

As the plaintiff, TQL bears the burden of establishing that it is entitled to such relief. *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). That is a heavy burden to bear. "This is because the preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.'" *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir. 1991)) (brackets and internal quotation omitted).

### 1. *TQL Has Not Provided Enough Evidence At This Stage For The Court To Conclude That It Has A Strong Likelihood Of Success On The Merits.*

The first factor is whether TQL has demonstrated "a strong likelihood of success on the merits." *Leary*, 228 F.3d at 736 (quoting *McPherson v. Mich. High Sch. Athletic Ass'n,* 119 F.3d 453, 459 (6th Cir. 1997) (en banc)). Importantly, all of TQL's claims require proof that Daniels is (or, at least, has been) actually competing against TQL. TQL has provided several pieces of evidence in this regard. First, TQL submits that Daniels founded EDA Logistics, an LLC organized for conducting freight arrangement services. (TQL's Exs. to Prelim. Inj. Hr'g, Ex. 12, "W. Va. Sec'y of State Bus. Org. Detail"). Secondly, TQL provided evidence that the Federal Motor Carrier

Safety Administration granted the newly formed EDA Logistics "broker" motor carrier authority. (TQL's Exs. to Prelim. Inj. Hr'g, Exs. 13, 14, "FMCSA Licensing History"). When combined, these two pieces of evidence demonstrate that EDA exists and that it is authorized to compete with TQL.

Although these facts suffice to create a *plausible inference* that Daniels is actually competing against TQL, the only *solid conclusion* that the Court can draw from the evidence provided at this stage is that Daniels is at least preparing to compete with TQL. But, as "[p]reparing to compete is not equivalent to competing," this evidence alone is insufficient to support a preliminary injunction. *Cary Corp. v. Linder*, No. 80589, 2002 WL 31667316, at *6 (Ohio Ct. App. Nov. 27, 2002).

In an attempt to fill this analytical gap, TQL also offers evidence that, it says, not only shows that is Daniels is actually competing, but that he is specifically soliciting one of TQL's current customers. Specifically, TQL points to evidence that (1) Sunland, one of Daniels' customer accounts at TQL, has significantly decreased its book of business with TQL after Daniels' departure; and (2) 721 Logistics copied Daniels on two emails concerning a shipment from Sunland. Neither piece of evidence, considered alone or in conjunction, shows a "strong likelihood" that Daniels is actually competing with TQL. As for the first piece of evidence, there are myriad reasons why Sunland might have decreased its book of business with TQL. Maybe Sunland does not like the new TQL logistics account executive who now manages its account; perhaps COVID-19 hit Sunland hard and it decreased shipments across the board; or maybe Sunland just transferred its business to a new logistics company

(other than EDA Logistics). In short, the reason behind the drop off in Sunland's business is unclear. And, although it is certainly possible that Sunland transferred its business to EDA Logistics, the Court has yet to see evidence suggesting a "strong likelihood" that is the case.

Moreover, neither of the two emails 721 Logistics sent Daniels and Sunland concerning one of Sunland's potato starch shipments provide much additional insight. The two emails show that 721 Logistics copied Daniels on an early correspondence concerning this shipment from Sunland. Nowhere in the email chain does 721 Logistics (or Sunland) explain why it reached out to Daniels. And, equally as problematic for TQL, nowhere in the email chain does Daniels ever respond to 721 Logistics or Sunland. Without any additional context, the Court is hesitant to read these emails as evidence that Daniels is competing with TQL.

All said, TQL's evidence certainly shows that it is possible that Daniels is soliciting Sunland's business and that he is operating EDA Logistics as a direct competitor to TQL. But the "mere possibility of success" is not enough to justify a preliminary injunction. *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.,* 119 F.3d 393, 399, 402 (6th Cir. 1997) (citing *Mason Cnty. Med. Ass'n v. Knebel,* 563 F.2d 256, 261 n. 4 (6th Cir. 1977)). In fact, the Supreme Court expressly rejected the "possibility" standard as "too lenient," and instead required a higher showing on the grounds that a preliminary injunction is an "extraordinary remedy" with the dangerous potential to unjustly restrain the subject's liberty. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Consistent with that understanding, the Court can issue a

preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (*per curiam*)). TQL simply has not made a "clear" showing that Daniels is actually competing against TQL.

In fairness to TQL, this may be in part because TQL anticipated that Daniels would be present for the preliminary injunction hearing. TQL undoubtedly intended to ask him, under oath, about his past and current business activities. But Daniels was not there. And TQL had not subpoenaed him. Thus, the Court cannot draw any inferences about the testimony that he would have provided had he appeared. Rather, the Court must rely on the evidence that TQL did present. As noted above, that evidence falls short.

### 2. *The Irreparable Harm And Public Interest Factors Do Not Require A Preliminary Injunction.*

Although a finding that there is no likelihood of success on the merits is "usually fatal" to the request for a preliminary injunction, *Gonzales,* 225 F.3d at 625, the Court could still exercise "its discretion to issue a preliminary injunction if the movant has, at minimum, 'show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.'" *Six Clinics Holding Corp.*, 119 F.3d at 400 (quoting *Gaston Drugs, Inc. v. Metro. Life Ins. Co.,* 823 F.2d 984, 988 n. 2 (6th Cir.1987)). TQL, however, has not made such a showing here.

To demonstrate "irreparable harm," TQL would need to show that there is an "imminent" risk of a "certain, great, and actual" harm that creates a "clear and

present' need for equitable relief." *Lucero v. Detroit Pub. Schs.*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001). The injuries TQL alleges, including the loss of customer goodwill and the loss of fair competition due to the violation of a non-compete, usually constitute an irreparable injury. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). The existence, and extent, of TQL's injury, however, again depends on whether TQL can demonstrate that Daniels is currently violating his non-compete. As discussed above, TQL's evidence on that front creates a plausible inference that Daniels may have violated, and may be violating, his non-compete, but it falls short of providing "clear and convincing evidence" that he is doing so. *Deck v. City of Toledo*, 29 F. Supp. 2d 431, 433 (N.D. Ohio 1998) (citing *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968)) (noting that plaintiff has the burden of proof, by clear and convincing evidence, to warrant a preliminary injunction). As there is little evidence that Daniels is violating his non-compete, any resulting injury to TQL is necessarily speculative, as well. *See Hartman v. Acton*, No. 2:20-cv-1952, 2020 WL 1932896, at *4 (S.D. Ohio Apr. 21, 2020) (collecting cases). The "irreparable injury" prong, then, also weighs against a preliminary injunction.

The Court next examines whether a preliminary injunction (or lack thereof) would create a risk of substantial harm to others. To start, neither party has identified how the failure to enter a preliminary injunction would harm third parties. Rather, both parties focus their arguments on the harm that might occur if the Court were to grant the requested preliminary injunction. Those arguments are not

particularly relevant here, as the Court has already held that there is no "substantial likelihood of success on the merits" that can justify a preliminary injunction.[4]

Finally, the Court considers the effect of a preliminary injunction on the public interest. TQL argues that a preliminary injunction would serve the public interest for two reasons. Specifically, TQL asserts that a preliminary injunction would further (1) the public interest in upholding contracts and preventing unfair competition; and (2) the public interest in the fair, predictable administration of the freight-brokering industry. (Mot. for Prelim. Inj., Doc. 3, #80–81). Both arguments assume that Daniels is, in fact, violating his non-compete and that the preliminary injunction will prevent him from doing so. As discussed above, however, TQL might have plausibly alleged that Daniels is violating his non-compete, but it has not submitted enough evidence to establish a "substantial likelihood" that is the case. Accordingly, whether a preliminary injunction serves these public interests is also too speculative to justify such extraordinary relief.

On the other hand, the public has an interest in free and fair competition. If Daniels is not violating his non-compete, the public has an interest in allowing him to form his own company and participate in the freight-brokerage market. TQL, of

---

[4] Even so, Defendants' arguments are unpersuasive. Both in their briefs and at the preliminary injunction hearing, Defendants argued that a preliminary injunction would harm all current and former TQL employees. Specifically, Defendants alleged that TQL is particularly litigious, and the Court should not encourage TQL to continue to sue its former employees. Not only is this allegation vague and underdeveloped, but it is also unpersuasive. As the Court mentioned at the hearing, TQL's decision to enforce lawful non-compete agreements is appropriate, at least so long as TQL is not hiring and then terminating employees with the goal of reducing the work force available to competitors. Defendants have not submitted any evidence to suggest that this is the case. Therefore, Defendants' argument falls flat.

course, contends that this interest is irrelevant here because Daniels' competition is unlawful and in violation of his non-compete. But the Court is in no position to resolve that issue today. Moreover, substantial time may pass between now and final resolution in this case, especially since discovery has yet to even begin. If the Court were to preliminarily enjoin Daniels and EDA today, that injunction will likely remain in effect for some time after June 2021, which is the date when Daniels' non-compete expires (at least absent tolling of the covered period). If it turns out that Daniels, in fact, did not violate his non-compete, then he is entitled to compete after that date, and any preliminary injunction then in place would improperly interfere with the public's interest in free competition.

Therefore, on balance, the Court concludes that TQL is not entitled to a preliminary injunction at this time. That said, the Court's holding today is simply that TQL has not provided sufficient evidence at this time to substantiate an entitlement to preliminary injunctive relief. Should TQL provide the missing pieces at trial, that could well result in the Court imposing final injunctive relief on TQL's behalf based on the non-compete and non-solicitation provisions. In other words, the Court's denial of this motion is not an indication that the Court has concluded that injunctive relief is never available for harm of the type alleged here, but rather that TQL has not carried its burden of showing that such relief should be awarded now. *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981) (explaining that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits").

## CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss TQL's Complaint (Doc. 8) and **DISMISSES** TQL's tortious interference with a business relationship claim **WITHOUT PREJUDICE**. The Court also **DENIES** TQL's Motion for a Preliminary Injunction (Doc. 3).

**SO ORDERED.**

May 17, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**