## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**TOTAL QUALITY LOGISTICS, LLC,**

      **Plaintiff,**

        v.

**EDA LOGISTICS LLC, *et al.*,**

      **Defendants.**

      **Case No. 1:21-cv-164**
      **JUDGE DOUGLAS R. COLE**

### <u>OPINION AND ORDER</u>

Ryan Daniels worked for Total Quality Logistics, LLC (TQL), a company that acts as a middleman to find motor carriers with space available to carry loads for TQL's customers. While there, Daniels signed a non-competition and non-disclosure agreement. Daniels subsequently resigned. Now, TQL says he has violated that agreement. So it sued. The parties tried the matter to the bench. Only two witnesses testified: Daniels and a TQL "risk manager" who had investigated Daniels' departure.

Combining the evidence they presented with the relevant burden of proof, the Court concludes that TQL has shown (1) that some, but not all, of the contractual obligations at issue are enforceable and (2) that Daniels and EDA Logistics LLC (EDA) violated those obligations. Accordingly, as explained below, the Court awards TQL a portion of the relief it seeks. In particular, the Court **ORDERS** that, for 313 days from the entry of the injunction described below, Daniels shall neither solicit nor accept business from the customers with whom he worked at TQL.

Beyond that, though, the Court rejects the remaining relief TQL seeks, largely because the Court finds that TQL failed to substantiate its assertions that (1) it provided trade secret information to Daniels that he retained and is using to TQL's detriment, (2) Daniels' use of any techniques or information allegedly learned at TQL constituted unfair competition, or (3) TQL would have obtained the revenues from the loads Daniels serviced at EDA absent his illicit solicitation of those customers. Finally, the Court declines to award TQL punitive damages or attorneys' fees.

## FACTUAL BACKGROUND

### A. Daniels Joined TQL And Signed An Employment Agreement That Included A Noncompete.

Daniels joined TQL on January 4, 2016, in TQL's Charleston, West Virginia office. (Tr., Doc. 31, #827, 834). Before he joined TQL, he had never worked in the logistics industry. (*Id.* at #830–31). He had a degree in business administration (*id.* at #831), and his immediate past job had been in sales at Northwestern Mutual Insurance (*id.* at #971–72). TQL hired him as a Logistics Account Executive (LAE) trainee. (*Id.* at #794–95).

As is its typical practice when it hires LAE trainees, TQL required Daniels to execute a non-competition and non-disclosure agreement. TQL's offer letter to Daniels made that requirement clear. (*Id.* at #834). And the offer letter also provided a web link that allowed Daniels to review the agreement before his first day of work if he wished. (*Id.* at #832). In any event, on Daniels' first day at TQL, he signed the agreement. (*See* JX-2003).

2

That agreement forms the basis for this lawsuit. It begins with various recitals, asserting that, for example: (1) TQL is "unique" in the logistics industry in that it has "spent extensive time developing relationships with Customers, Motor Carriers, suppliers and others within the [logistics] Industry;" (2) that it "provides extensive training on ways to succeed within the industry;" (3) that employees will gain access to "proprietary software" that is unique and to "intimate knowledge" of TQL's "business model, its Customers, Motor Carriers, suppliers, contact information, lanes, pricing, sales strategy, service and other confidential information;" (4) that employees will have access to various "Confidential Information," including information relating to the above, and (5) that disclosure of this information would harm TQL. (*Id.*).

The agreement then sets forth the employee's obligations. As relevant here, Daniels agreed that during his employment and for one year after, he would not (1) work for a "Competing Business," (2) work in any capacity in any "transportation-intermediary business," (3) solicit any TQL customer or attempt to divert business from TQL, (4) interfere with any business relationship with any TQL customer or motor carrier, nor (5) solicit any TQL employees. (*Id.*). Daniels further agreed that the one year would be tolled during any time he was violating these obligations. (*Id.*). Separately, he agreed that he would not use any TQL Confidential Information after leaving the company. (*Id.*). Finally, he agreed that if a court found he had violated his obligations, he would be "liable for costs, expenses, and reasonable attorneys' fees incurred by TQL." (*Id.*). But the fee-shifting is unilateral. That is, the agreement

contains no countervailing provision that would make TQL liable for attorneys' fees should a court rule in an employee's favor.

## B. While At TQL, Daniels Received Training In Logistics.

During his time as an LAE trainee and later as an LAE, TQL trained Daniels. Although the agreement characterizes the training as "extensive" and involving "proprietary information," the evidence TQL presented at the hearing did little to substantiate those characterizations. True, a TQL employee testified that TQL believes that it has a "good recipe" and that it likes to hire employees without experience in the industry so that TQL can teach them "our way." (Doc. 31, #809). And to that end, TQL presented a chart that showed the numerous training modules that Daniels participated in while at TQL. (*Id.* at #847; PX-0002).

But while TQL claims it trains employees on "the TQL recipe," (Doc. 31, #855), the witness shed little light on the ingredients of that "recipe." For example, much of the training appeared to involve teaching new employees, who did not have experience in logistics, the "lingo" used in the trade. (*Id.* at #810 ("Training was something that was newer when I began there. We started compiling a manual of things that we wanted to teach people, you know, and those were—the lingo.")). This included terms such as "drayage," (*id.* at #853), or "what a refrigerated truck was, the acronyms in the industry, the weights, and the tandems …." (*Id.* at #810). Beyond that, trainees could listen in on customer calls to learn about specific customer pricing tolerance, typical routes that motor carriers may travel, and other customer-specific or motor carrier-specific things of the sort.

Part of the problem with providing specifics at trial may have been that the TQL witness admitted that he lacked direct knowledge of much of the training that Daniels received. (*Id.* at #857–58). As he described, he underwent similar training some years back, but he acknowledged that the content had changed in many circumstances. The evidence also suggests that many courses lasted only a few minutes. (*See generally* PX-0002 (listing minutes of duration for some classes, including classes, for example, of "est. 2 mins," "est. 6 mins," and "est. 8 mins")). Further, the witness could not offer even an estimate as to the total time of training that Daniels received. (Doc. 31, #860). Nor can that be determined from the exhibits— they do not list the times for all of the classes TQL provided Daniels.

When the Court asked the witness how he would "describe the TQL way or the TQL recipe," he originally responded with vague descriptions of it as "very long" and "very intricate." (*Id.* at #816). And he claimed that he had "never heard of any other competitor having as many trainers as [TQL does]." (*Id.*). But when pressed for examples of actual substance, the best he could muster was a "kind of a flow chart" that describes the sales cycle. (*Id.*). He also noted that TQL provides the trainees with scripts to get past a gatekeeper and overcome customer objections during sales calls. (*Id.* at #817). As far as specifics go, that was about it.

As an example of confidential information that TQL provided Daniels, the TQL witness pointed to the Load Manager software. That software is a proprietary system that TQL uses to track orders and shipments. It also contains certain customer-specific information "such as customer names, customer information, pricing, lines

5

data, [and] margins" that TQL claims is confidential. (*Id.* at #768). That information is available to LAEs when making sales calls. When asked to identify other information or training that may be proprietary or a trade secret, the TQL witness offered this example: LAE trainees are taught that a driver should precool a refrigerated truck before it is sent to pick up a cold product, like ice cream. (*Id.* at #818–19).

Daniels also testified about the training. In particular, he asserted that at least some of the training materials consisted of "stuff you could find on YouTube." (*Id.* at #982). That said, Daniels admits he received "a fair bit of training" while at TQL. (*Id.*).

## C. While At TQL, Daniels Worked To Match Customers Who Wished To Ship Products With Motor Carriers Who Could Do So.

As mentioned above, Daniels worked at TQL, first as an LAE trainee, then as an LAE, until the summer of 2020. As its name implies, TQL is a logistics company. It neither has products to ship, nor trucks in which to ship them. Rather, as an LAE, Daniels' basic job was to (often cold) call potential customers who may need products or materials moved from one location to another and then try to match those customers with trucks that could accommodate that load at a price acceptable to the customer. TQL kept for itself the difference between what the customer paid and what the motor carrier charged.

While at TQL, Daniels provided logistics services to many customers. Some of the customer leads he developed himself through cold calling. Other leads were

companies that had previously done business with TQL but did not have a current LAE assigned.

The evidence also showed that the logistics business is very competitive. TQL's competitors can and do call the same customers as TQL, and they typically have access to the same motor carriers. Plus much of the work is awarded based on which logistics company offers the best price for a given load.

By all accounts, Daniels experienced some success at TQL. (*Id.* at #984). He first became a Saturday group leader, which meant he ran the office on Saturdays "when there's not a salaried boss there." (*Id.* at #983). And ultimately, he became a sales team leader. (*Id.* at #984).

While at TQL, Daniels serviced clients located all over the country. (*Id.* at #988). This includes the nine customers who are particularly relevant to TQL's allegations here. As to at least eight of those customers, there is no dispute that the customers' relationships with TQL pre-dated Daniels' employment there. And as to the last of the nine, Crupper Bloodstock, TQL may not have provided services before Daniels joined, but TQL had identified the company as a prospect.

**D.     Daniels Resigned From TQL In June 2020 Due To Concerns About The Company's Response To The COVID Pandemic.**

On June 29, 2020, Daniels resigned from TQL. (*Id.* at #998). According to Daniels, his resignation stemmed from TQL's response to the COVID-19 pandemic. During the first few months of the COVID-19 pandemic's emergence in this country, TQL allowed employees to work from home. By June 2020, though, TQL decided its employees should return to the office. Daniels did not wish to do so, as his child had

respiratory issues. Daniels was concerned that workplace exposure might result in Daniels bringing the virus home. When he raised his concerns, TQL would not allow him to continue working from home. (*Id.* at #1027). So he resigned. When he did, he did not take any physical or electronic documents from TQL with him. (*Id.* at #1040).

## E. Shortly After Leaving TQL, Daniels Joined A Competing Company.

Leaving TQL did not end Daniels' time in the logistics industry. When he first left, he looked for jobs outside that industry, but given the ongoing COVID-19 pandemic, he struggled. (*Id.* at #1047). Daniels then "received a call from an old friend" who owned Direct Freight Solutions, a one-man competitor in the logistics arena based in New Jersey. (*Id.* at #1003–04). The owner offered Daniels a job. Essentially, the owner planned to transfer his book of business to Daniels, while retaining a portion of the income that the business generated to help fund his retirement. Unlike TQL, Direct Freight Solutions allowed Daniels to work from his home in Charleston. During his time there, he did not solicit business from or work with any of his former customers from TQL. (*Id.* at #1005).

That plan abruptly ended just a few weeks later in early August 2020, though, when the business owner unexpectedly passed away. According to Daniels, that "kind of put [him] in a tough spot." (*Id.* at #1006). The pandemic "was making it a lot harder to find opportunities," particularly as he needed to work from home. (*Id.*). So he felt "backed into a corner." (*Id.*). That was especially true as his "insurance licenses had lapsed," meaning it would be difficult to return to that industry. (*Id.*).

**F.    Daniels Creates His Own Logistics Company, And TQL Sues Daniels For Violating The Noncompete.**

About ten days later, on August 20, 2020, Daniels formed EDA. (*Id.* at #1007). Daniels is the sole member of the LLC. EDA competes directly with TQL. It does "the same type of work from many of the same customers." (*Id.* at #1008). This includes nine customers with whom Daniels had worked at TQL: America's Second Harvest of the Big Bend, Inc., Canada West Supply d/b/a Greenway Metals, Chesapeake Machine Co., Crupper Bloodstock, LLC, Dallas Trailer Repair Co., Inc., Innovation Concepts, Inc., Sunland Trading, Inc., Transportation Services, Intl., and UPF Corp. These nine customers, and particularly Sunland Trading, made up "the bulk" of EDA's business. (*Id.* at 1012–13). And, at least as to Sunland, the loads that Daniels brokered through EDA were "all very similar loads to the one [he was] doing at TQL." (*Id.* at #1018). Between August 2020 and the end of 2021, EDA brokered some 497 loads, at least 457 of which were for customers with whom Daniels worked at TQL. Not surprisingly given those numbers, of the $166,000 in profits Daniels earned brokering those loads, more than $155,000 of it resulted from those same customers.[1]

On February 22, 2021, TQL sued EDA and Daniels in the Clermont County Court of Common Pleas in Ohio. (Compl. Doc. 2). TQL asserted claims including breach of contract, misappropriation of trade secrets, tortious interference with contract, and tortious interference with a business relationship. (*Id.*). It sought both

---

[1] It bears noting that the one-year noncompete period specified in the contract ended June 2021, absent any tolling. Thus, at least some of these profits are from outside the contractually-specified period (again, absent tolling).

damages and injunctive relief. TQL further sought a temporary restraining order, but the state court denied that motion.

After that, on March 8, 2021, EDA and Daniels removed the case to this Court on diversity grounds. TQL then sought a preliminary injunction. But it failed to subpoena Daniels for the hearing on that motion. Accordingly, at the preliminary injunction hearing, while TQL managed to show that Daniels had created EDA, it could not show that EDA was competing with TQL, or indeed that EDA was engaged in any activities at all, logistics or otherwise. The Court thus denied the requested preliminary injunction for failure of proof.

The matter proceeded through discovery to a bench trial. There, TQL sought injunctive relief, compensatory damages, punitive damages, and attorneys' fees. Two witnesses testified. First, TQL presented Marc Bostwick, a TQL risk manager who investigated the circumstances surrounding Daniels' departure. TQL then called Daniels himself. Defense counsel elicited testimony from both witnesses as well but did not call any other witnesses. Beyond that, the parties collectively offered some fifteen exhibits, competing proposed findings of fact, and post-hearing briefing.

## LAW AND ANALYSIS

At its core, this is a non-compete case governed by Ohio law. There is little question here that Daniels violated the express terms of his employment agreement. Rather, the parties chiefly dispute whether those provisions are enforceable. On that front, Ohio enforces contractual terms that seek to prevent *unfair* competition but denies enforcement to those outlawing merely *ordinary* competition.

10

So, how does that distinction play out here? The Court provides the longer answer to that question below, but the short answer is this: To the extent that TQL alleges Daniels is using confidential or trade secret information, TQL is correct that that would constitute unfair competition. However, TQL must prove the misappropriation of such information by clear and convincing evidence. And TQL failed to do so. So, those information-based claims fall short.

That doesn't get Daniels entirely out of the woods, though. A company also has the right to protect its customer relationships, especially those that employees develop on the employer's dime. Thus, a prohibition on soliciting those customers, at least for a reasonable period, validly restrains unfair competition. And there, TQL *has* proven by clear and convincing evidence that Daniels violated that prohibition early and often. Accordingly, the Court finds that TQL is entitled to some, but not all, of the relief it seeks.

### A.      Ohio Law Allows Limited Enforcement Of Noncompete Agreements.

Under Ohio law, "only reasonable noncompetition agreements are enforceable." *Lake Land Emp. Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 33 (Ohio 2004). In other words, such covenants are "enforced to the extent necessary to protect an employer's legitimate interests." *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 544–45 (Ohio 1975). And what that means is that courts will enforce such provisions to prevent unfair competition but not ordinary competition. *See, e.g.*, *Geloff v. R.C. Hemm's Glass Shops, Inc.*, 167 N.E.3d 1095, 1099–103 (Ohio Ct. App. 2021) (declining to enforce a noncompete agreement).

11

The Ohio Supreme Court described the framework for assessing enforceability—that is, separating unfair from ordinary competition—in the oft-cited *Raimonde* decision. There, the Ohio Supreme Court held that such covenants are enforceable if "reasonable," and assessed reasonability against these nine factors:

> '(t)he absence or presence of limitations as to time and space, * * * whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.'

*Raimonde*, 325 N.E.2d at 547 (citation omitted). Under this test, "a covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Id.*

As the test indicates, Ohio recognizes that employers may have a variety of different "legitimate" interests that support enforceability. And, although Ohio law does not expressly describe it this way, "legitimacy" for these purposes can generally be understood in economic terms. That is, Ohio courts will enforce these types of provisions where such enforcement is likely to provide a net social welfare benefit.

Some examples illustrate the point. *Raimonde* recognizes that an employer has a legitimate interest in protecting confidential information it has shared with its

employees. *Id.* (directing courts to consider "whether the employee is possessed with confidential information or trade secrets"). Such protection makes sense when measured in social welfare terms. The person who developed the recipe for KFC's eleven herbs and spices, or the chemical formulation for WD-40,[2] may wish to hire additional personnel, share the information with them, and thereby expand production. That makes more product available to more consumers, enhancing social welfare. But innovators may decline to share such secrets with employees if courts do not enforce contracts protecting against down-the-road disclosure. Thus, the law promotes social welfare by generally enforcing provisions preventing employees from disclosing or using such information to an employer's detriment. *See, e.g.*, *Brentlinger Enters. v. Curran*, 752 N.E.2d 994, 1001 (Ohio Ct. App. 2001) ("Generally, the only business interests which have been deemed sufficient to justify enforcement of a noncompete clause against a former employee are preventing the disclosure of the former employer's trade secrets or the use of the former employer's proprietary customer information to solicit the former employer's customers.").

Likewise, consider the situation where an employer pays to provide training that gives an employee a valuable skill. *Raimonde*, 325 N.E.2d at 547 (directing courts to consider "whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment"). Both the employee (who now has a new skill, which makes them more employable) and society

---

[2] *See 10 Trade Secrets We Wish We Knew*, How Stuff Works (last visited July 12, 2023), https://money.howstuffworks.com/10-trade-secrets.htm (listing ten famous trade secrets, including the two noted above).

(who receives the resulting products or services) benefit from that training. But if competitors are free to "poach" that employee, those competitors will benefit from the training while avoiding the cost of providing it. Understood that way, enforcing a noncompete prevents free-riding on a competitor's training dollars, thereby encouraging the socially-useful investment in training in the first instance. *Compare Penzone, Inc. v. Koster*, No. 07AP-569, 2008 WL 256546, at *4 (Ohio Ct. App. Jan. 31, 2008) (citing training that salon provided as a basis for enforcing noncompete provision that prevented stylist from serving same customers at competitor location), *with Mark Phillips Salon/Spa v. Blessing*, No. 23875, 2011 WL 332755, at *3 (Ohio Ct. App. Jan. 28, 2011) (declining to enforce a noncompete where there was no "evidence that [the employer] made a significant investment in training" the defendant). *See generally* Jonathan M. Barnett & Ted Sichelman, *The Case for Noncompetes*, 87 U. CHI. L. REV. 953, 970 n.56 (2020) (citing sources arguing that employers will reduce investment in employee training absent noncompetes).

Customer goodwill provides yet another example. *Raimonde*, 325 N.E.2d at 547 (directing courts to consider "whether the employee represents the sole contact with the customer"). Imagine a one-person shop providing services that customers want, but that require substantial customer interaction. If the owner hires new employees and trains them to provide that same service, the owner could expand their business and serve more customers. But absent an enforceable nonsolicitation agreement, the owner may be inviting the fox into the henhouse. The employee who has developed the customer-specific goodwill may depart to a competitor, taking the

14

customer with them. Given that concern, a business owner may hesitate to hire employees and expand, even if it would otherwise be beneficial for the owner and the customers to do so. So again, that provides a legitimate basis for enforcing reasonable noncompetes under Ohio law. *See, e.g.*, *Penzone*, 2008 WL 256546, at *4 (enforcing a noncompete in part to allow employer to "[p]rotect[] customer relations" with "loyal" customers).

Contrast the above, though, with situations where an employer seeks to use such a covenant merely "to stifle the inherent skill and experience of the employee." *Raimonde*, 325 N.E.2d at 25. In those settings, enforcement provides no social benefit. That is, enforcement will not incentivize the employer to make socially-beneficial training investments it otherwise would not have made—the employee already has the skill at issue. Rather, precluding the employee from using that skill, merely because he or she has now departed from the employer, imposes costs both on the employee (who can no longer use the pre-existing skill) and the public (who can no longer benefit from that skill). And such enforcement provides no socially useful counterweight. Thus, Ohio law frowns on such arrangements. *See, e.g.*, *J & B Fleet Indus. Supply, Inc. v. Miller*, No. 09 MA 173, 2011 WL 2536668, at *14 (Ohio Ct. App. June 16, 2011) (declining to enforce noncompete that sought to "stifle [the former employee's] sales and marketing skills and experience, much of which [the employee] had developed prior to his employment with [the plaintiff]").

In sum, Ohio law enforces contractual provisions in employment contracts that restrain competition only if the employer can prove a socially beneficial purpose—a "legitimate interest"—underlying such enforcement.

**B.    TQL Asserts Two Legitimate Interests Supporting Enforcement, One Of Which It Substantiates, And One Of Which It Does Not.**

TQL points to two interests supporting enforcement here. First, it claims that it has provided its employees with extensive confidential information and training relating to the logistics field. Second, it asserts that it has provided its employees customer access and that it needs enforcement of the nonsolicitation provision to prevent employees from stealing that goodwill from the company. As described below, TQL has substantiated the latter interest but not the former. More specifically, as to the former, TQL failed to provide sufficient evidence that it provided training that warrants protection through a noncompete.

Because the Court's analysis turns in large part on the evidence that TQL offered, the Court begins with a word about the burden of proof. Perhaps reflecting Ohio's general reticence about enforcing contracts in restraint of trade, Ohio requires parties seeking to enforce noncompetition provisions to clear a high threshold. In particular, that party must establish reasonableness under the *Raimonde* test by clear and convincing evidence. *See, e.g.*, *MetroHealth Sys. v. Khandelwal*, 183 N.E.3d 590, 595 (Ohio Ct. App. 2022). And note that, as Ohio law applies this burden in connection with establishing reasonableness—a precursor to enforcement—that burden presumably applies independent of the enforcement mechanism (whether by injunction or by damages).

16

With that in mind, start with TQL's first asserted interest—that Daniels "had access to confidential information and trade secrets while employed by TQL," and received "comprehensive training," both of which he is now using to TQL's detriment. (Pltf. Post-Tr. Br., Doc. 32, #1067). It is one thing to assert that and another thing to prove it by clear and convincing evidence. TQL fell short of that latter hurdle here in multiple ways.

First, even if Daniels once had access to confidential information, such as the Load Manager software, TQL never showed that Daniels *retained* access to that information. TQL did not show, for example, that Daniels absconded with a copy of the information stored there. TQL also failed to show how Daniels' previous exposure to such information as a whole harms TQL now. (The Court acknowledges that confidential information relating to specific customers, rather than to the compilation maintained in the Load Manager software generally, may be different. And the Court separately addresses customer information below.)

Second, as for the "comprehensive training," TQL likewise failed to prove the content or extent of that training, show how the material conveyed was proprietary or trade secret, or show how Daniels' access to that information could or did harm TQL in his new employment. True, the TQL witness testified about the training in TQL's "recipe." But his testimony was long on characterizations—that the training was "very long" and "very intricate"—and short on specifics. (Doc. 31, #816). And the specifics he did offer suggested that much of the "recipe" consisted of teaching trade-specific language. True, trainees also learned certain customer-specific information

17

when listening in on calls. But while that information may be protectable as to those specific customers or motor carriers—more on that below—that differs from the kind of specialized training that would support a general noncompetition agreement.

TQL perhaps came closest when discussing "a flow chart" used to teach the logistics sales cycle. In connection with that, TQL also provided the trainees with scripts to use to get past a gatekeeper and overcome customer objections during sales calls. (*Id.* at #816–17). Even that, though, strikes the Court as a slim reed to support a nationwide prohibition on participating in the logistics industry as a whole.

Essentially, the Court does not dispute that training in specialized skills or access to confidential information *could* support enforcement of a noncompete. But TQL failed to show by clear and convincing evidence that it has provided Daniels access to sufficient training or information to support enforcing a nationwide ban on Daniels' participation in the logistics industry.

In arriving at the result, the Court acknowledges TQL's recently filed supplemental authority. (Doc. 35 (citing *Total Quality Logistics, LLC v. Leonard*, No. CA2022-09-048, 2023 WL 4311273, *5–6 (Ohio Ct. App. July 3, 2023)). In *Leonard*, an Ohio appeals court found that the "extensive training" that TQL had proved in that case gave rise to a legitimate enforcement interest. That may well have been. The Court does not know what training evidence TQL provided there. But *here*, TQL failed to prove the necessary training.

The story is different, though, when it comes to customer-specific information. TQL *did* prove by clear and convincing evidence that Daniels established a

18

relationship for logistics services with multiple customers while at TQL. Indeed, as noted, Daniels did not work in the logistics industry before joining TQL, so any customer relationships he had for such services upon leaving TQL ostensibly arose during his time there. And as to at least some customers, Daniels received a leg up from TQL when the company provided him customer access in the first instance. That goodwill strikes the Court as a "legitimate interest" for TQL to protect. So the only remaining question then is whether TQL is doing so in a "reasonable" fashion under the *Raimonde* factors.

TQL is. To see that, take the *Raimonde* factors in order. The time (one-year) and geographic scope (across the country as applied to customers he serviced) are reasonable. *See, e.g.*, *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 276 (Ohio Ct. App. 2000) (enforcing three-year noncompetition provision with worldwide scope). Daniels was the main point of contact for those customers. He received confidential information about those customers during his time at TQL, including as to pricing, policies, etc. His competition for those customers at EDA is unfair in that he seeks to deprive TQL of the goodwill that it paid to establish with those customers through him.

At least to the extent that the Court will enforce the agreement, enforcement will not stifle Daniels' inherent skills, as he can still work in logistics, just not with these customers. The benefit to TQL—the opportunity to re-establish its relationship with these customers—is proportional to the harm to Daniels. Enforcement, at least as limited to these nine customers, does not deprive Daniels of his sole means of

support. Next, the activity the Court will suppress (contacts with these nine customers) "was actually developed during the period of employment" at TQL. And finally, the forbidden employment (contacting these customers) is not "incidental" to Daniels' activities at EDA but the core of these activities.

Thus, the nonsolicitation agreement both protects a legitimate interest and does so in a reasonable fashion. That makes it enforceable. To the extent that TQL seeks a broader noncompete, though, the Court finds that TQL has fallen short of the necessary burden of proof. So the Court declines any broader enforcement.

## C.    TQL Has Failed To Prove Its Trade Secret Claim.

Beyond the noncompete, TQL maintains that Daniels has also breached his employment agreement, and violated Ohio law, by misappropriating trade secrets. (*See* JX-2003 at ¶¶ 5, 9(c)); Ohio Rev. Code § 1331.61 et seq. The Court, however, finds that TQL failed to prove that Daniels misappropriated or was using any protectable information.

Under Ohio law, a trade secret is any information that both (1) derives economic value from not being generally known or readily ascertainable by others by proper means, and (2) is the subject of reasonable efforts to maintain secrecy. Ohio Rev. Code § 1331.61(D) (defining "trade secret"). And the employment agreement specifically prohibits employees like Daniels from disclosing or using TQL trade secrets. Moreover, in that same paragraph, the agreement also precludes disclosure of "Confidential Information," a contractually defined term that may cast an even

20

broader net than Ohio's definition of trade secrets. (*See* JX-2003 at 1–2 (defining "Confidential Information")).

TQL claims it makes various information available to its employees, including Daniels, that falls within these categories. It points, for example, to its Load Manager software, storing a host of customer-specific information about lanes, pricing, customer preferences, contact information, and the like. (*See* Doc. 32, #1073).

The Court agrees with TQL that the type of information to which it refers, if organized into a compilation, could constitute a trade secret under Ohio law. *See Salemi v. Cleveland Metroparks*, 49 N.E.3d 1296, 1302 (Ohio 2016) ("Customer lists have been held to constitute trade secrets."). There is little doubt, then, that if an employee stole an employer's carefully compiled and reasonably protected customer database, that could give rise to a trade secret claim. *Id.*

The problem again is one of proof. TQL did not prove Daniels took any customer information database when he left. No evidence suggests Daniels copied the Load Manager database nor took any compilation of information with him from TQL. True, he had telephone numbers and contact names for the few customers whom he had serviced. But telephone numbers for a small number of companies are "readily ascertainable by proper means." *See* Ohio Rev. Code § 1331.61(D). And from the trial testimony, contact names are easily discovered as part of the cold-calling process. It is the *compilation* of such information for a large group of customers that gives rise to a protectable trade secret. *See Salemi*, 49 N.E.3d at 1302. TQL has such a compilation, but no evidence suggests that Daniels misappropriated it.

21

Beyond that, Daniels also knew the prices that he had charged the customers with whom he had worked in the past. But from the evidence at trial, it sounds like pricing information in this industry is volatile. After all, the business consists of arranging transportation for loads on tractor-trailers. The cost of providing that transportation is inextricably linked to, among other things, petroleum prices, which often change. And to the extent that Daniels learned the margin TQL normally tacks on, the testimony showed logistics is a price-sensitive industry. Customer calls often included TQL employees engaging in price discovery efforts to see what price the market, or at least that specific customer, would bear. All of that is to say that any customer-specific pricing information Daniels learned at TQL had a short shelf-life, if any, as a trade secret, and as to specific customers likely could have been learned by legitimate means (during the sale process).

In sum, the Court concludes that TQL possesses trade secret information, but that it failed to show that Daniels left TQL with, or is currently using, any actionable trade secret information. Thus, the trade secret claim fails.

## D. The Tortious Interference Claim Against EDA Fails But Against Daniels Succeeds.

Separately, TQL asserts two flavors of tortious interference claims. First, TQL asserts that EDA, which Daniels formed and wholly owns, tortiously interfered with Daniels' contract with TQL by employing Daniels. Second, TQL claims that Daniels and EDA both tortiously interfered with TQL's business relationships with its customers. The Court takes them in that order.

22

The first claim suffers from multiple defects. First, a party cannot tortiously interfere with itself. Yet, here, EDA and Daniels are essentially one and the same. Thus, it is questionable whether a tortious interference claim even lies. But the Court ultimately need not answer that question, because the tortious interference claim here is directed solely at EDA's decision to *employ* Daniels. That is, the tortious interference that TQL attacks is the alleged interference with the noncompetition provision that prevents Daniels from working for any competitor. But the Court has found that provision unenforceable, so it cannot provide the basis for a tortious interference claim.

The latter tortious interference claim, though, is different. A tortious interference with a business relationship or contract claim has five elements: (1) a business relationship or contract; (2) the defendant's knowledge of the relationship or contract; (3) the defendant's intentional or improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages." *Woods v. Sharkin*, 192 N.E.3d 1174, 1198 (Ohio Ct. App. 2022).

Here, TQL had a business relationship with the customers Daniels serviced, Daniels knew of that relationship, and he acted to prevent contract formation or terminate a business relationship (between the customers and TQL) by seeking to continue servicing those customers after he left TQL. Daniels does not really dispute any of that. Rather, Daniels' chief contention is that his efforts were not improper, but to the contrary, were privileged as ordinary competition.

23

In the end, then, the matter comes down to whether Daniels was privileged to contact these customers, or in other words, whether doing so amounted to ordinary competition. As the Court already found above, though, Daniels did not have that privilege. Rather, he breached an enforceable contractual provision in contacting these customers. As his means were improper, they were not privileged as ordinary competition. And thus Daniels is liable for this claim.

### E. TQL Is Entitled To Some Injunctive Relief But Has Failed To Prove It Is Entitled To Compensatory Damages.

Having found that TQL has prevailed in part, that leaves the question of the appropriate remedy. The contract itself first specifies injunctive relief for violating the main covenant at issue, although it also leaves open the possibility that TQL could seek damages. (*See* JX-2003 at ¶ 9(e)). Consistent with the contract's inclination, courts often enforce noncompete provisions through injunctive means. *See, e.g.*, *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). The Court agrees such relief is appropriate here.

Both parties agree that, as a general matter, the party seeking an injunction must show: (1) an irreparable injury; (2) no adequate remedy at law; (3) that the balance of hardships supports issuance; and (4) that an injunction serves the public interest.[3] (Doc. 32, #1077; Def. Post-Tr. Br., Doc. 33, #1121). Those elements are

---

[3] Interestingly, the question of whether federal or state law governs the availability of such relief in this diversity action is apparently not entirely settled. *See Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1293–99 (11th Cir. 2022) (Pryor, J., concurring) (noting that this is a knotty choice-of-law question and tracing the history of the development of Article III equitable powers in diversity cases both before and after *Erie*). Here, though, the answer to that question matters little for two reasons. First, both federal law and Ohio law apply the

typically present when considering restrictive covenants. The loss of customer goodwill is an irreparable injury (element one) and one that often gives rise to hard-to-determine damages (element two). For example, one cannot be sure that a given customer would choose to remain with a service provider once that customer's preferred point of contact has left, so it is hard to say what profits, if any, the employer lost. Moreover, the harm to the employee from enforcement is proportional to the harm the employer would suffer absent enforcement—one basically mirrors the other. Finally, at least when dealing with largely interchangeable services—like the logistics services here—enforcement typically does not harm the public. Rather, as described above, the public usually benefits from enforcement that is designed to protect a "legitimate" interest.

Beyond that, the point of a nonsolicitation provision like the one the Court finds enforceable here is (1) to allow the employer, if possible, to insert a new customer contact into the relationship, and thereby maintain the customer's goodwill, and (2) to deprive the departing employee of an economic incentive of seeking to "steal" the customer in the first instance. Both of those are best accomplished by preventing the departing employee from continuing to service the customer through the auspices of a new employer.

Accordingly, the Court finds that such injunctive relief is the appropriate remedy here. TQL is entitled to an opportunity to seek to reclaim those nine

---

same general framework for injunctive relief. Second, as noted above, the parties agree on the basic framework here, although disagreeing on the appropriate outcome under that framework.

customers if it can. And Daniels must stand down for the contractually specified period to allow TQL to do so.

In imposing this remedy, the Court recognizes that its delay in resolving this suit may have deprived TQL of some of an injunction's benefit, as the passage of time may have diminished that goodwill in and of itself. That said, the Court is left with little by way of alternate remedies. The principal form of alternative relief, of course, would be monetary damages. And "[i]t has been consistently held in Ohio that in a breach of a covenant not to compete, the usual measure of damages is lost profits. *Briggs v. GLA Water Mgmt.*, Nos. WD-12-062, WD-12-063, 2014 WL 1413934, at *7 (Ohio Ct. App. Apr. 11, 2014) (citing *Burckhardt v. Burckhardt*, 42 Ohio St. 474 (1885)). But TQL failed to prove that Daniels' breach caused TQL any specific amount of lost profits. True, TQL showed that the nine customers at issue used Daniels' services after he left TQL's employ, and TQL established the profits *Daniels* obtained as a result. But TQL did not show that, absent Daniels' intervention, the customers would have used TQL, or relatedly the profits that TQL would have generated if they did. There is simply no way to know on the record here whether, or to what extent, what profits TQL "lost."[4]

---

[4] Admittedly, that may be a difficult showing to make in the best of circumstances, but TQL did not even try. It failed to present even a single witness who had direct evidence of the efforts that TQL made to pursue these customers after Daniels left. Nor did it present any witnesses showing how Daniels' competition thwarted TQL's efforts to secure business from these companies. Nor did it present any evidence regarding its profit on contracts with these customers or with customers generally. Because TQL failed to prove damages, the Court need not reach the question of whether a party enforcing a noncompete can receive both injunctive and monetary relief as TQL claims. (*See* Doc. 35 (citing *TQL v. Johnson*, Case No. CA2022-09-049, 2023 WL 3047474 (Ohio App. April 24, 2023)).

Ohio law prohibits speculative damages. *MADFAN, Inc. v. Makris*, 86 N.E.3d 707, 711 (Ohio Ct. App. 2017) ("[I]n 'Ohio, a tort recovery may not be had for damages which are speculative[.]'") (quoting *Johnson v. Univ. Hosps. of Cleveland*, 540 N.E.2d 1370 (Ohio 1989)). Given that any damages amount here would be entirely speculative, the Court concludes that the only available remedy is injunctive relief. Accordingly, the Court will Order that for a 313-day period following entry of this Order, Daniels not solicit or accept orders for logistics services from these customers, or any other customers that he serviced at TQL.[5]

That leaves two issues—punitive damages and attorneys' fees. Start with the former. As noted above, TQL failed to prove that Daniels misappropriated any actionable trade secrets. Thus, punitive damages are unavailable under Ohio's trade-secret statute. *See* Ohio Rev. Code § 1333.63(B). And as for TQL's one viable "tortious interference" claim, it is at best a thinly-disguised breach of contract claim. That is, the interference amounted to Daniels breaching his contractual obligations. But Ohio law is well-settled: a breach of contract does not give rise to punitive damages. *Digit. & Analog Design Corp. v. N. Supply Co.*, 540 N.E.2d 1358, 1367 (Ohio 1989) ("The law is quite clear in Ohio that: As a general rule exemplary damages are not recoverable in actions for the breach of contracts, irrespective of the motive on the part of defendant which prompted the breach. No more can be recovered as damages than will fully compensate the party injured." (cleaned up)).

---

[5] The contract specifies a one-year period. But the Court finds that, from June 29, 2020, when Daniels quit, to August 20, 2020, when Daniels formed EDA, he did not solicit TQL customers. Thus, the contractually specified one-year term ran during that fifty-two day period, leaving 313 days of "unserved time" on the contractual term.

True, Ohio law creates an exception to this general rule where a separate tort is also at issue. But here, as noted, this tort is not "separate" at all. Rather, the allegedly tortious conduct here "constitutes nothing more than a breach of contract for which punitive damages generally cannot be awarded." *Id.* So TQL has not proven an entitlement to punitive damages.

That leaves attorneys' fees. The contract provides that, in the event "the Employee is found by a court of competent jurisdiction to have violated the terms of this Agreement, Employee shall be liable for costs, expenses, and reasonable attorneys' fees incurred by TQL." (JX-2003). This is a unilateral fee-shifting provision—Daniels must pay TQL's fees if he loses, but TQL need not pay Daniels' fees if he wins. That language seems clear enough, and it suggests Daniels owes something here.

Defendants argue, though, that the language is not enforceable under *Wilborn v. Bank One Corp.*, 906 N.E.2d 396 (Ohio 2009). (*See* Doc. 33, #1127).[6] And to Defendants' credit, the Ohio Supreme Court seemingly spoke definitively in *Wilborn*: "[A]greements to pay attorney fees in a 'contract of adhesion, where the party with little or no bargaining power has no realistic choice as to terms,' are not enforceable." *Id.* At 400 (quoting *Nottingdale Homeowners' Ass'n, Inc. v. Darby*, 514 N.E.2d 702, 707 n.7 (Ohio 1987)). Whether and to what extent that language applies here, though, is a thorny issue.

---

[6] Both Defendants and Plaintiff list the case as a 2017 case. So far as the Court can tell, though, the Ohio Supreme Court decided the case in 2009.

First, some history. In 2005, the Sixth Circuit explained in *Scotts Co. v. Cent. Garden and Pet Co.* that "since 1841 'Ohio law has followed the traditional rule that a stipulation by parties to a contract which permits attorney fees to be award as costs of collection upon default is void and against public policy.'" 403 F.3d 781, 791 (6th Cir. 2005) (quoting *Colonel's, Inc. v. Cincinnati Milacron Mktg. Co.*, Nos. 96-1243, 96-1244, 1998 WL 321061, at *4 (6th Cir. June 1, 1998)). The sole exception, *Scotts* said, was attorneys' fee provisions that the parties had "specifically negotiated." *Id.* So, at least according to *Scotts*, Ohio courts did not enforce fee-shifting provisions— unilateral or bilateral—absent evidence the parties had specifically and intentionally addressed that issue during negotiations. *But see Hilb, Rogal & Hamilton Agency of Dayton, Inc. v. Reynolds*, 610 N.E.2d 1102 (Ohio Ct. App. 1992) (upholding fee-shifting provision in standard employment agreement without evidence of negotiation). Of course, under that standard, if it were still correct, the provision here would be unenforceable. Nothing suggests the parties specifically negotiated this term.

But that is not the end of the story. In 2015, the Sixth Circuit revisited the issue in light of *Wilborn*. And the Sixth Circuit decided that *Wilborn expanded* enforcement of fee-shifting provisions. In *Allied Industrial Scrap, Inc. v. OmniSource Corp.*, the Sixth Circuit explained that "[t]hree years after the *Scotts* case, the Ohio Supreme Court in *Wilborn* … made it clear that it *would enforce* such unilateral or one-sided fee-shifting contract provisions." 776 F.3d 452, 453 (6th Cir. 2015) (citation

29

omitted) (emphasis added). So given *Allied Industrial*, it would appear attorneys' fees—even under unilateral fee-shifting provisions—are fair game in Ohio.

There is an important wrinkle though. The *Allied Industrial* court went on to say that "Ohio law will generally give effect to such fee-shifting provisions when there is no duress." *Id.* And while that panel focused only on duress, *Wilborn* seemed to take a somewhat broader view of this exception: "In contrast, agreements to pay attorney fees in a 'contract of adhesion, where the party with little or no bargaining power has no realistic choice as to terms,' are not enforceable." 906 N.E.2d at 400 (quoting *Darby*, 514 N.E.2d at 707 n.7).

The exact contours of the exception, whether limited to cases involving duress or applied more broadly to contracts of adhesion generally, mattered little in *Allied Industrial*. There, it was clear that the term survived under either approach. According to that court:

> The contract that includes this clause was negotiated between two experienced and sophisticated commercial entities. There was no duress. The parties were on an equal footing.

*Allied Industrial*, 776 F.3d at 453. And it bears noting that the contract in *Allied Industrial* involved three million pounds of scrap copper.

But as relevant here, after *Wilborn* and *Allied Industrial* the question before this Court appears to be whether this fee-shifting provision was part of a contract of adhesion, where the person against whom enforcement is sought had no "realistic choices as to terms." *Wilborn*, 906 N.E.2d at 400. And a subsequent Ohio appellate court decision provides further insight into how Ohio courts will approach that issue.

*See Pro. Solutions Ins. Co. v. Novak, LLP*, No. 108839, 2020 WL 5949853 (Ohio Ct. App. Oct. 8, 2020).

In *Novak*, the Ohio appellate court considered a legal-malpractice insurance policy that included a unilateral fee-shifting provision entitling the insurer to reimbursement for expenses it incurred in seeking recovery of a deductible from the insured. *Id.* at *6. The court found the provision unenforceable under *Wilborn* because the insurance policy was "a boilerplate provision that was not freely negotiated." *Id.* Thus, "[t]he stipulation to pay attorney fees was not agreed upon through free and understanding negotiation." *Id.* Moreover, the court observed, unilateral fee-shifting provisions act as a penalty and encourage litigation. They are included in such contracts "for the sole interest" of the drafting party, and the other party "gain[s] no benefit from the term." *Id.*

In many ways, *Novak* is on point here. Daniels did not have any meaningful opportunity to negotiate the employment agreement, just like *Novak*. TQL presented the agreement and essentially told Daniels to take it or leave it. Indeed, the TQL witness testified that he could not identify a single occasion on which TQL had accepted any change to any term in its standard employment agreement. And, also as in *Novak*, the parties had unequal bargaining power. Daniels had no experience at all in the logistics industry. TQL is a large company that employs scores of LAEs and LAE trainees. Indeed, if Ohio courts consider a lawyer negotiating a legal malpractice policy to have "little or no bargaining power" and "no realistic choice as to terms," it strikes the Court that this would be all the more true as to Daniels. *Id.* True, Daniels

31

could have refused TQL's offer of employment. But the attorney in *Novak* likewise could have refused to buy the insurance policy. So, a contracting party's ability to walk away rather than sign a contract, without more, apparently does not give rise to enforceability under Ohio law.

TQL responds in a few ways. First, TQL says that *Novak* is distinguishable because it "aris[e] from insurance contracts and commercial leases." (Reply, Doc. 34, #1156). True, but so what? The principles that *Novak* announces are stated in broad terms and do not seem to turn on the contract's subject matter. Second, TQL cites *Hilb*, noting that there an Ohio appellate court upheld fee-shifting in an employment agreement. (Doc. 34, #1156). Again true. But two things are worth noting. First, much water has passed under the bridge since the Ohio appeals court's 1992 decision in *Hilb*, perhaps most importantly the Ohio Supreme Court's 2009 decision in *Wilborn*. Second, as the concurring judge in *Hilb* noted, the parties there did not raise the "troublesome issue" of whether unilateral fee-shifting provisions, as opposed to traditional bilateral prevailing party provisions, are unconscionable. 610 N.E.2d at 1109 (Fain, J., concurring). But that issue is squarely before the Court here. Third, and most recently, TQL submits the Ohio appeals court decision in *Leonard* as supplemental authority on the attorneys' fee issue. (Doc. 35). True enough, there the court reversed a trial court and upheld TQL's unilateral fee-shifting provision. *Leonard*, 2023 WL 4311273, at *9. But the decision includes no discussion of case law on the issue, and thus no explanation of how that result squares with the Ohio Supreme Court's decision in *Wilborn*. And this Court's job is to predict how the Ohio

32

Supreme Court would come down on this debate. *See Estes v. Cincinnati Ins. Co.*, 23 F.4th 695, 699 (6th Cir. 2022).

In sum, the Court concludes that, given *Wilborn* and *Novak*, and on the record here, the unilateral fee-shifting provision is not enforceable against Daniels as a matter of Ohio law.

## CONCLUSION

For the above reasons, the Court concludes that Daniels improperly solicited and accepted business from the customers with whom he worked at TQL. In doing so, Daniels breached a valid and enforceable provision in his agreement with TQL. Thus, the Court **ENJOINS** Daniels as follows:

For a period of 313 days from the Court's entry of this Order, Daniels shall not solicit or accept logistics business from any customer with whom he did business while at TQL. To the extent that Daniels has already arranged for transportation that will occur within the next 30 days, Daniels need not seek to dissolve that contract. But Daniels cannot contact any such customers seeking new business, nor accept any such business from them.

Beyond that the Court **GRANTS JUDGMENT** in Daniels' and EDA's favor on TQL's remaining claims and demands against them. Moreover, because both TQL and Defendants prevailed as to various parts of the claims here, the Court concludes that no party is the "prevailing party" for purposes of Fed. R. Civ. P. 54.

The Clerk shall enter judgment consistent with the above and **TERMINATE** this matter on the Court's docket, except that the Court shall retain jurisdiction to enforce the above-described injunctive relief.

**SO ORDERED.**

July 31, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**